# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

CLERK'S OFFICE
A TRUE COPY
Aug 05, 2025
Kyle Hedrickson
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.    25-mj-618 |
| Any electronic device to include cellular telephones on person or in close proximity of LAWRENCE J. CHASE. | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Eastern_____ District of _____Wisconsin_____ , there is now concealed *(identify the person or describe the property to be seized)*:

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2251(a) and (e) and 1470 | Production of child pornography Transmission of obscenity to a minor |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Jennifer L. Peterson*
_____
*Applicant's signature*

Jennifer L. Peterson, FBI Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means)*.

Date: ___8/4/2025___

*Tiffany Woelfel*
_____
*Judge's signature*

City and state: ___Green Bay, Wisconsin___    Honorable Tiffany E. Woelfel, U.S. Magistrate Judge
_____
*Printed name and title*

**AFFIDAVIT**

I, Jennifer L. Peterson, having been first duly sworn, depose and state as follows:

**INTRODUCTION**

1.      I have been employed as a Special Agent with the Federal Bureau of Investigation since 2008.  While employed as a Special Agent, I have investigated federal criminal violations related to cybercrimes, child exploitation, and child pornography.  I have received training to investigate child pornography and child exploitation crimes and have had the opportunity to observe and review examples of child pornography (as defined in 18 U.S.C. § 2256) in different forms of media including computer media. As a result of my training, experience, and discussions with other law enforcement officers assigned to investigate child pornography and child exploitation, I am familiar with methods by which electronic devices are used as the means for receiving, transmitting, possessing, and distributing images and videos depicting minors engaged in sexually explicit conduct (child pornography). I have also received training and gained experience in interview and interrogation techniques with enhanced training specific to cybercrimes, electronic device identification and forensic review, as well as sophisticated techniques used to commit cybercrimes.

2.      Based upon the information described below, I submit that probable cause exists to believe that contraband, evidence, fruits and instrumentalities of violations of Title 18, United States Code, Sections 2251(a) and (e) (production of child pornography) and 1470 (transmission of obscene material to a minor), more particularly described in Attachment B, can be found at 622 Broad Street in Menasha, Wisconsin (the Subject Premises) and all vehicles and outbuildings associated with the residence.

1

3. The statements contained in this affidavit are based in part on information provided by Law Enforcement Agents; written reports about this and other investigations that I have received, directly or indirectly, from other Law Enforcement Agents; information gathered from the service of administrative subpoenas; the results of physical surveillance conducted by Law Enforcement Agents; independent investigation and analysis by Law Enforcement Agents/Analysts; and my experience, training and background as a Task Force Officer/Investigator. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that contraband and evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2251(a) and 1470.

## DEFINITIONS

4. The following definitions apply to the Affidavit and Attachment B to this Affidavit:

a. "Cellular telephone" or "cell phone" means a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates,

2

appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may include geolocation information indicating where the cell phone was at particular times.

   b. "Chat," refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

   c. "Chat room," refers to the ability of individuals to meet in one location on the Internet in order to communicate electronically in real-time to other individuals. Individuals may also have the ability to transmit electronic files to other individuals within the chat room

   d. "Child Pornography" is defined in 18 U.S.C. § 2256(8) as any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

   e. "Computer" is defined pursuant to 18 U.S.C. § 1030(e)(1) as "an electronic, magnetic, optical, electrochemical, or other high-speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

   f. "Computer Server" or "Server," is a computer that is attached to a dedicated network and serves many users. A web server, for example, is a computer that hosts

the data associated with a website. That web server receives requests from a user and delivers information from the server to the user's computer via the Internet. A domain name system (DNS) server, in essence, is a computer on the Internet that routes communications when a user types a domain name, such as www.cnn.com, into his or her web browser. Essentially, the domain name must be translated into an Internet Protocol (IP) address so the computer hosting the web site may be located, and the DNS server provides this function.

g. "Computer hardware" consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

h. "Computer software" is digital information that can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

i. "Computer-related documentation" consists of written, recorded, printed, or electronically stored material that explains or illustrates how to configure or use computer hardware, computer software, or other related items.

j. "Computer passwords, pass phrases, and data security devices" consist of

4

information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password or pass phrase (a string of alphanumeric characters) usually operates as a sort of digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

k.      "Electronic Communication Service" means any service which provides to users thereof the ability to send or receive wire or electronic communications.

l.      "Electronic storage devices" includes computers, cellular telephones, tablets, and devices designed specifically to store electronic information (e.g., external hard drives and USB "thumb drives").  Many of these devices also permit users to communicate electronic information through the internet or through the cellular telephone network (e.g., computers, cellular telephones, and tablet devices such as an iPad).

m.      "Internet Service Providers" (ISPs) are commercial organizations that are in business to provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet including telephone-based dial-up, broadband based access via digital subscriber line (DSL) or cable television, dedicated circuits, or satellite-based subscription.  ISPs typically charge a fee based upon the type of connection and volume of

5

data, called bandwidth, which the connection supports.  Many ISPs assign each subscriber an account name – a user name or screen name, an "e-mail address," an e-mail mailbox, and a personal password selected by the subscriber.  By using a computer equipped with a modem, the subscriber can establish communication with an Internet Service Provider (ISP) over a telephone line, through a cable system or via satellite, and can access the Internet by using his or her account name and personal password.

        n.     An Internet Protocol address (also known as an IP address) is a set of numbers which identify a computer on the Internet.  IP addresses follow the formats of ###.###.###.### wherein each of the numbers are between 0 and 255, is known as Internet Protocol Version 4 (IPv4), or ####.####.####.####.####.####.####.#### wherein each digit is between 0 and f in hexadecimal form, is known as Internet Protocol Version 6 (IPv6).  Because of the continued growth of the volume of devices connected to the Internet, IPv4 addresses are expected to be exhausted.  To address the need to assign unique IP addresses to those devices, many Internet Service Providers are transitioning from IPv4 to IPv6 addresses.  An example of an IPv6 address is 2006:1ab2:34c5:0000:0000:6d7e:0890:1234.  Computers use IP addresses to identify each other on the Internet. Internet Protocol addresses are registered to specific individuals or entities. Each time an individual accesses the Internet, the computer from which that individual initiates access is assigned an IP address.

        o.     "Hash Value" refers to the process of using a mathematical function, often called an algorithm, to generate a numerical identifier for data.  A hash value can be thought of as a "digital fingerprint" for data.  If the data is changed, even very slightly (like the addition or deletion of a comma or a period), the hash value changes.  Therefore, if a file such as a digital photo is a hash value match to a known file, it means that the digital photo is an exact copy of the

known file.

p.      "Media Access Control" (MAC) address means a hardware identification number that uniquely identifies each device on a network. The equipment that connects a computer to a network is commonly referred to as a network adapter. Most network adapters have a MAC address assigned by the manufacturer of the adapter that is designed to be a unique identifying number. A unique MAC address allows for proper routing of communications on a network. Because the MAC address does not change and is intended to be unique, a MAC address can allow law enforcement to identify whether communications sent or received at different times are associated with the same adapter.

q.      "Minor" means any person under the age of eighteen years. *See* 18 U.S.C. § 2256(1).

r.      "Mobile applications" are small, specialized programs downloaded onto mobile devices that can enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a game.

s.      "Records," "documents," and "materials" include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including writings and drawings), photographic form (including prints, negatives, videotapes, motion pictures, and photocopies), mechanical form (including printing and typing) or electrical, electronic or magnetic form (including tape recordings, compact discs, electronic or magnetic storage devices such as hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, smart cards, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

t. "Remote Computing Service" means the provision to the public of computer storage or processing services by means of an electronic communication system.

u. "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person. See 18 U.S.C. § 2256(2).

v. "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. See 18 U.S.C. § 2256(5).

## ELECTRONIC STORAGE DEVICES AND FORENSIC ANALYSIS

5. I am aware through training, experience, and consulting with other law enforcement agents/analysts with specialized knowledge and training in computers, networks, and Internet communications that to properly retrieve and analyze electronically stored (computer) data, and to ensure accuracy and completeness of such data and to prevent loss of the data either from accidental or programmed destruction, it is necessary to conduct a forensic examination of the electronic storage devices. To ensure such accuracy and completeness, it may also be necessary to analyze not only the electronic storage devices, but also peripheral devices which may be interdependent, the software to operate them, and related instruction manuals containing directions concerning operation of the device computer and software. As described above and in Attachment B, this application seeks permission to search and seize records that might be found on the proposed search location, in whatever form they are found. One form in which the records might be found is stored on a computer's hard drive, other storage media, within a hand-held electronic device such as a cellular telephone or a tablet device (e.g.,

8

an iPad device). Some of this electronic information, as explained below, might take a form that becomes meaningful only upon forensic analysis.

6.      Based on my knowledge, training, and experience, I know that computer and other electronic device hardware, peripheral devices, software, documentation, and passwords may be important to a criminal investigation in three distinct and important respects.

        a.      The objects themselves may be instrumentalities used to commit the crime;

        b.      the objects may have been used to collect and store information about crimes (in the form of electronic data); and

        c.      the objects may be contraband or fruits of the crime.

7.      I submit that if a computer or other electronic storage device is found on the premises, there is probable cause to believe those records will be stored in that electronic storage device, for at least the following reasons:

        a.      Based on my knowledge, training, and experience, I know that electronic storage device files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person deletes a file on an electronic storage device, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. It follows that deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, if the

9

electronic storage device uses an operating system (in the case, for example, of a computer, cellular telephone, or tablet device) the device may also contain a record of deleted data in a swap or recovery file.

        b.     Wholly apart from user-generated files, electronic storage device storage media in particular, computers' internal hard drives, contain electronic evidence of how the device was used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation, and file system data structures.  Electronic storage device users typically do not erase or delete this evidence because special software is typically required for that task.  However, it is technically possible to delete this information.

        c.     Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or cache.  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

    8.     As further described in Attachment B, this application seeks permission to locate not only electronic storage device files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how electronic storage devices were used, the purpose of their use, who used them, and when.

    9.     Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processor, picture, and movie files), electronic storage device storage media can contain other forms of electronic evidence as described below:

        a.     Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or

edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the electronic storage device was in use. Electronic storage device file systems can record information about the dates files were created and the sequence in which they were created.

      b.    As explained herein, information stored within an electronic storage device and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within an electronic storage device (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the electronic storage device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the electronic storage device was remotely accessed, thus inculpating or exculpating the electronic storage device owner. Further, electronic storage device activity can indicate how and when the electronic storage device was accessed or used. For example, as described herein, computers typically contain information that logs computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which

the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within an electronic storage device may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer or cellular telephone may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera). The geographic and timeline information described herein may either inculpate or exculpate the electronic storage device user. Last, information stored within an electronic storage device may provide relevant insight into the device user's state of mind as it relates to the offense under investigation. For example, information within the electronic storage device may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the electronic storage device or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Whether data stored on an electronic storage device is relevant to the investigation may depend on other information stored on the electronic storage device and the application of knowledge about how an electronic storage device works. Therefore, contextual information necessary to understand the evidence described in Attachment B also falls within the scope of the warrant.

d.      Further, in finding evidence of how an electronic storage device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, I know from training and experience that it is possible that malicious software can be installed on a computer, often without the computer user's knowledge, that can allow the computer to be used by others, sometimes without the knowledge of the computer owner.

10.     Based upon my knowledge, training and experience, and after having consulted with FBI computer forensic personnel, I know that a thorough search for information stored in storage media often requires agents/investigators to seize most or all storage media to be searched later in a controlled environment.  This is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  Additionally, to properly examine the storage media in a controlled environment, it is often necessary that some electronic storage device equipment, peripherals, instructions, and software be seized and examined in the controlled environment. This is true because of the following:

a.      The nature of evidence.  As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how an electronic storage device has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.

b.      The volume of evidence.  Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names.  This may require searching authorities to peruse all the stored data to determine which particular files are evidence or

13

instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

        c.     Technical requirements. Electronic storage devices can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of electronic storage device hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

        d.     Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

      11.     In light of these concerns, I hereby request the Court's permission to seize the electronic storage devices, associated storage media, and associated peripherals that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the hardware for the evidence described, if, upon arriving at the scene, the agents/investigators executing the search conclude that it would be impractical to search the hardware, media, or peripherals on-site for this evidence.

      12.     I know that when an individual uses a computer to commit crimes involving child pornography, the individuals' computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic

storage device is an instrumentality of the crime because it is used as a means of committing the criminal offense. From my training and experience, I believe that an electronic storage device used to commit a crime of this type may contain data that is evidence of how the electronic storage device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

## BIOMETRIC ACCESS TO DEVICES

13.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

14.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

15

15.     If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face.  For example, this feature is available on certain Android devices and is called "Trusted Face."  During the Trusted Face registration process, the user holds the device in front of his or her face.  The device's front-facing camera then analyzes and records data based on the user's facial characteristics.  The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face.  Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

16.     If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises.  For example, on certain Microsoft devices, this feature is called "Windows Hello."  During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face.  The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises.  The device can then be unlocked if the infrared-sensitive camera detects the registered irises.  Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

17.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.  This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

18.     As discussed in this Affidavit, I have reason to believe that one or more digital devices will be found during the search.  The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement.  Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

19.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled.  This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time.  For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days.  Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

20.     Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, I request authority for law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of the device owner to the fingerprint scanner of the devices found at the Subject Premises, or in any vehicle associated with the Subject Premises; (2) hold the devices

17

found at the Subject Premises in front of the device user's face to activate the facial recognition feature; and/or (3) hold the devices found at the Subject Premises in front of the device user's face and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant.

## PEER TO PEER FILE SHARING

21.     A significant aspect of the internet, as it relates to this investigation, is peer to peer (P2P) file sharing. P2P file sharing is a method of communication available to internet users through the use of widely available software. This investigation focuses on the P2P network called BitTorrent. There are several different software applications that can be used to access these different P2P networks and these applications operate in essentially the same manner. Computers linked together through the internet using this software form a network that allows for the sharing of digital files between users on the network.

22.     These P2P networks are commonly referred to as decentralized networks because each user of the network is able to distribute information and queries directly through other users of the network, rather than relying on a central server to act as an indexing agent, where all of the information is first deposited before it is distributed.

23.     To access the P2P networks user must first obtain the required P2P software, this software can be downloaded for free from the internet. In general, P2P software allows the user to set up files on a computer to be shared with others running compatible P2P software. When the P2P software is installed on a computer, the user is directed to specify a "shared" folder. All files placed in that user's "shared" folder are available to be shared with and download by any other user connected to the P2P network. Therefore, a user needs simply to move a file from one folder to another to stop the distribution across the internet. Further, once a file or files are placed

in a shared folder the distribution of that file(s) is dependent only on the machine being turned on and connected to the internet.

24.     The BitTorrent network is a very popular and publicly available P2P filesharing network. Most computers that are part of this network are referred to as "peers" or "clients." A peer/client can simultaneously provide files to some peers/clients while downloading files from other peers/clients. The BitTorrent network can be accessed by peer/client computers via many different BitTorrent network client (software) programs, including uTorrent, Vuze, Deluge, qBittorrent, and others. These are publicly available and typically free P2P client software programs that can be downloaded from the internet.

25.     BitTorrent sets up its searches by keywords typically on torrent websites. The results of a keyword search are displayed to the user. The website does not contain the files being shared, only the file referred to as a "torrent." A torrent file defines the files being shared and contains file names, file sizes, file paths, the total number of pieces, the size of each piece, the SHA-1 hash value of each piece, and the torrent type (public or private). The torrent file does not contain the desired content; it simply defines what is available. A user may then select a torrent file(s) from the search results for download. For example, a person interested in obtaining child pornography images/videos could open the BitTorrent website on his/her computer and conduct a keyword search for files using a term such as "preteen sex." The results of the search are returned to the user's computer and displayed on the torrent site. The user then selects a torrent from the results displayed which contain the file(s) the user wants to download. Once the torrent file is downloaded, the user's previously installed BitTorrent client program utilizes the torrent file to obtain the desired content on the network. The file is downloaded directly from the computer or computers sharing the file. The users can receive pieces of the selected file from

19

numerous sources at once, or it can be from a single source. Once received, the pieces are then reassembled into the entire selected file. The downloaded file is stored in a folder previously designated by the user and/or the client program on the user's computer or designated external storage media or location on the user's computer. The downloaded file will remain until moved or deleted.

26.     One of the advantages of P2P file sharing is that multiple files may be downloaded at the same time. In addition, a user may download parts of one file from more than one source computer at a time. For example, a BitTorrent user downloading a movie file may actually receive parts of the movie from multiple computers. The advantage of this is that it speeds up the time it takes to download the file. It is also possible to download the file or files from only one computer.

27.     The BitTorrent Network bases its file shares on the Secure Hash Algorithm (SHA1). This mathematical algorithm allows for the digital fingerprinting of data. Once you check a file or files with a SHA1 hashing utility capable of generating this SHA1 value (the fingerprint), that will be a fixed-length unique identifier for that file. The SHA1 is secure because it is computationally infeasible for two files with different content to have the same SHA1 hash value.

28.     A P2P file transfer is assisted by reference to an Internet Protocol (IP) address. This address, expressed as four numbers separated by decimal points, is unique to a particular computer during an online session.  The IP address provides a unique location making it possible for data to be transferred between computers. Most P2P software does not display the IP address of the person sharing the file to the user. Third party software is available to identify the IP address of the P2P computer sharing a particular file.

29.     IP addresses can be dynamic, meaning that the Internet Service Provider (ISP) can assign a different unique number to a computer when it accesses the internet.  IP addresses might also be static, if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the internet.

**PROBABLE CAUSE**

30.     On March 27, 2025, a parent reported to the Anne Arundel County Police Department (AAPD) in Pasadena, Maryland, that their minor daughter (hereinafter referred to as CV1) was involved in communicating with an adult male from Wisconsin via text messages, telephone number 920-850-7869, and exchanging obscene material.  The conversations were sexual in nature, with the adult male requesting to see nude photos and videos of CV1 to include her breasts, vagina, and touching herself. LAWRNECE sent nude pictures of himself in return.

31.     Upon interviewing CV1, CV1 disclosed to AAPD she met the male individual who introduced himself as LAWRENCE, approximately two weeks prior to reporting on the app called Y99.in, which is a chat room.  CV1 advised the two began texting and exchanging nude photos of each other.  CV1 said she told LAWRENCE that she was 11 years old, and his response was "okay."  LAWRENCE stated he was 21 or 22 years old and was from Wisconsin.

32.     Between February 24, 2025, and March 27, 2025, a total of 192 photos were sent between CV1 and LAWRENCE.  LAWRENCE sent 56 photos in which his face can clearly been seen.  LAWRENCE sent 21 photos that show his penis, both erect and non-erect, and testicles.  CV1 sent 14 photos that were explicit and suggestive in nature.  A total of 57 videos were sent between the two of them.  CV1 sent 13 videos to LAWRENCE and LAWRENCE sent CV1 20 videos that were sexually explicit.

33.     On March 1, 2025, the following exchanges occurred:

21

12:54PM - LAWRENCE sent a video of himself masturbating.
12:58PM - LAWRENCE asks, *"Can I see under your shirt please?"*
1:02PM - CV1 sent an image of her left breast.
1:03PM - LAWRENCE says, *"Can I see something else mommy."*
CV1 says, *"Depends what it is."*
LAWRENCE says, *"Your pussy mommy."*
9:45PM - CV1 asks, *"What's your real name?"*
LAWRENCE says, *"Lawrence hbu."*
CV1 responds *"CV1, sorry I'm asking."*

34.     On March 16, 2025, the following exchanges occurred:

10:57PM - LAWRENCES says, *"Can I have another video of your pussy please mommy."*
11:00PM - CV1 sends a one minute and one second video file showing her touching and exposing her vagina.
11:02PM - LAWRENCE sends CV1 a picture of his penis with what appears to be semen on his stomach/waist.
10:41PM - LAWRENCE sends another image of his genitals.
10:44PM – LAWRENCE sends a video of himself masturbating.

35.     On March 19, 2025, the following exchanges occurred:

7:48PM - CV1 says, *"I've been lying to you about something and I feel so damn bad about it."* CV1 then goes on to say that she isn't 20.
LAWRENCE asks, *"How old are you?"*
CV1 says she is 14 years old.
LAWRENCE asks why she lied.
CV1 says, *"I just thought you wouldn't want to date me…"*
LAWRENCE says, *"I do tho."*
CV1 says, *"Do you still?"*
LAWRENCE says, *"Yes."*

36.     On March 20, 2025, at 8:05PM, LAWRENCE said, *"I want to eat your pussy out so badly."* On March 21, 2025, at 7:18AM CV1 asks LAWRENCE what kind of picture he wants. LAWRENCE says, *"I want to see your pussy and tits and if you can your ass hehehe."* CV1 then sent two pictures at 7:59AM of her breasts and vagina. Then at 8:04AM CV1 sent a picture of her bare buttocks. On March 22, 2025, the two exchanged more explicit pictures. At 9:38PM, LAWRENCE also asks, *"Can I have a video of you playing with your pussy??"*

37.     On April 4, 2025, a Grand Jury Subpoena was sent to Verizon for subscriber and

account information for 920-850-7869. On April 28, 2025, Verizon responded with subscriber information as Jeffrey Ryan Dalrymple, 624 Broad Street, Menasha, Wisconsin 54952. A Facebook search of Jeffrey Dalrymple in Menasha yielded one result with a male subject married to Stephanie Dalrymple, mother of LAWRENCE. Stephanie's account revealed photos of a male individual identified as LAWRENCE. LAWRENCE's profile was subsequently found in connection with Stephanie.

38.     A review of Accurint records and records obtained from NCIC/Wisconsin for LAWRENCE J. CHASE, 622 Broad Street, Menasha, WI revealed LAWRENCE J. CHASE, DOB May 26, 2003, and SSAN 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.

39.     Based on the above-stated facts, I believe there is probable cause to believe that between approximately February 24, 2025, and March 27, 2025, in the State and Eastern District of Wisconsin, Lawrence J. Chase, committed a violation of Title 18, United States Code, Section 2251(a) and (e), "production of child pornography," and committed a violation of Title 18, United States Code, Section 1470, "transmission of obscenity to a minor."

40.     I believe there is probable cause to believe that evidence of the text message exchanges with LAWRENCE and CV1, along with potential other victims yet to be identified, could be located on the subject's cellular device or any other electronic devices maintained by the subject.

## BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, AND THE INTERNET

41.     I have had both training and experience in the investigation of computer-related crimes. Based on my training, experience, and knowledge, I know the following:

a.     Computers, cellular telephones, and other electronic storage devices (collectively electronic storage devices) have dramatically changed the way in which

23

individuals interested in child pornography interact with each other.  Electronic storage devices basically serve four functions in connection with child pornography:  production, communication, distribution, and storage.

b.      Child pornographers can now transfer printed photographs into a computer-readable format with a device known as a scanner.  Furthermore, with the advent of digital cameras, when the photograph is taken it is saved as a digital file that can be directly transferred to a device by simply connecting the camera to the electronic storage device.   In the last ten years, the resolution of pictures taken by digital cameras has increased dramatically, meaning the photos taken with digital cameras have become sharper and crisper.  Photos taken on a digital camera are stored on a removable memory card in the camera.  These memory cards often store terabytes of data, which provides enough space to store thousands of high-resolution photographs.  Video recorders, which once recorded video onto tapes or mini-CDs, now can save video footage in a digital format directly to a hard drive in the camera.  The video files can be easily transferred from the video recorder to a computer.  Many electronic storage devices (e.g., computers, cellular telephones, and tablets), have cameras built into the device which allows users to create and store still and video images on the device.  Moreover, if the device has internet connectivity, users can distribute still and video images from the device.

c.      Internet-enabled electronic storage devices can connect to other internet-enabled devices the world over.  The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child pornography.  Child pornography can be transferred via electronic mail or through file transfer protocols (FTPs) to anyone with access to an internet-enabled electronic storage device.  Because of the proliferation of commercial

24

services that provide electronic mail service, chat services (i.e., "Instant Messaging"), and easy access to the Internet, electronic storage devices are the preferred method of distribution and receipt of child pornographic materials.

        d.      Electronic storage devices are the ideal repository for child pornography. The amount of information that an electronic storage device can hold has grown exponentially over the last decade. Electronic storage devices can store thousands of images at very high resolution. In addition, there are numerous options available for the storage of computer or digital files. One-terabyte external and internal hard drives are not uncommon. Other media storage devices include CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices that are plugged into a port on a computer or other electronic storage device. It is extremely easy for an individual to take a photo with a digital camera, upload that photo to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices (CDs and DVDs are unique in that special software must be used to save or "burn" files onto them). Many electronic storage devices can easily be concealed and carried on an individual's person.

        e.      The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

        f.      Individuals also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Google, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any internet-enabled electronic

storage device. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's electronic storage device in most cases.

g.       As is the case with most digital technology, communications by way of electronic storage device can be saved or stored on the device. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, an electronic storage device user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

h.       Based on my knowledge, training, and experience, I know that electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

48.       Based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards,

cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage.

49. Additionally, based upon my training and experience and information related to me by agents and others involved in the forensic examination of computers, I know that routers, modems, and network equipment used to connect computers to the Internet often provide valuable evidence of, and are instrumentalities of, a crime. This is equally true of so-called "wireless routers," which create localized networks that allow individuals to connect to the Internet wirelessly. Though wireless networks may be "secured" (in that they require an individual to enter an alphanumeric key or password before gaining access to the network) or "unsecured" (in that an individual may access the wireless network without a key or password), wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime—including, for example, serving as the instrument through which the perpetrator of the Internet-based crime connected to the Internet and, potentially, containing logging information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator used to access the network. Moreover, I know that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

50. Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who transport, distribute, receive, possess, and/or access with intent to view child pornography:

b. Such individuals may receive sexual gratification, stimulation, and

27

satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

        c.      Such individuals may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

        d.      Likewise, such individuals often maintain their child pornography images in a digital or electronic format in a safe, secure, and private environment, such as a computer and surrounding area. These child pornography images are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, to enable the individual to view the child pornography images, which are valued highly. Some of these individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis.

        e.      Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices using forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.

        f.      Such individuals also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material,

and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

g.      Such individuals prefer not to be without their child pornography for any prolonged period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world. Thus, even if an individual, uses a portable device (such as a mobile phone) to access the internet and child pornography, it is more likely than not that evidence of this access will be found in the Subject Premises, Subject Vehicle or a device located on the Subject Person, as set forth in Attachment A.

51.    I believe the resident attempting the production of child pornography at the Subject Premises likely displays characteristics common to individuals who possess, access with intent to view, and distribute child pornography based on his history of distributing child exploitation material as set forth in this affidavit.

## CONCLUSION

52.    I respectfully request that this Court issue a search warrant for the location and items described in Attachment A authorizing the seizure and search of the items described in Attachment B.


_Jennifer L. Peterson_
Special Agent Jennifer L. Peterson
Federal Bureau of Investigations


Sworn to before me telephonically this   4th   day of August 2025.

_Tiffany  Woelfel_
Honorable Tiffany E. Woelfel
United States Magistrate Judge

**<u>ATTACHMENT A</u>**

**DESCRIPTION OF ITEMS TO BE SEARCHED**

Any electronic device to include cellular telephones on person or in close proximity of LAWRENCE J. CHASE.

# ATTACHMENT B

## ITEMS TO BE SEIZED

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use, or which is or has been used as the means of committing a criminal offense, namely violations of 18 U.S.C. § 2251(a) and (e) and 1470:

1. Computers or digital storage media used as a means to commit the violations described above.

2. For any computer or digital storage medium whose seizure is otherwise authorized by this warrant, and any computer or digital storage medium that contains or in which are stored records or information that is otherwise called for by this warrant (hereinafter, "computer"):

   a. evidence of who used, owned, or controlled the computer at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved user names and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b. evidence of software that would allow others to control the computer, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c. evidence of the lack of such malicious software;

31

d.  evidence indicating how and when the computer was accessed or used to
    determine the chronological context of computer access, use, and events relating
    to the crime(s) under investigation and to the computer user;

e.  evidence indicating the computer user's knowledge and/or intent as it relates to
    the crime(s) under investigation;

f.  evidence of the attachment to the computer of other storage devices or similar
    containers for electronic evidence;

g.  evidence of programs (and associated data) that are designed to eliminate data
    from the computer;

h.  evidence of the times the computer was used;

i.  passwords, encryption keys, and other access devices that may be necessary to
    access the computer;

j.  documentation and manuals that may be necessary to access the computer or to
    conduct a forensic examination of the computer;

k.  records of or information about Internet Protocol addresses used by the computer;

l.  records of or information about the computer's Internet activity, including
    firewall logs, caches, browser history and cookies, "bookmarked" or "favorite"
    web pages, search terms that the user entered into any Internet search engine, and
    records of user-typed web addresses; and

m.  contextual information necessary to understand the evidence described in this
    attachment.

3.  Routers, modems, and network equipment used to connect computers to the Internet.

32

4. Child pornography, as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2), and child erotica.

5. Records, information, and items relating to violations of the statutes described above including:

   a. Records, information, and items relating to the occupancy or ownership of the Subject Premises, 622 Broad Street, Menasha, Wisconsin, including utility and telephone bills, mail envelopes, or addressed correspondence;

   b. Records, information, and items relating to the ownership or use of computer equipment found in the above residence, including sales receipts, bills for Internet access, and handwritten notes;

   c. Records and information relating to the identity or location of the persons suspected of violating the statutes described above;

   d. Records and information relating to sexual exploitation of children, including correspondence and communications between users of child pornography and exploitation websites.

   e. Records and information showing access to and/or use of any electronic messaging application; and

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

33

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including, but not limited to, desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded, including, but not limited to, external and internal hard drives, flash drives, thumb drives, micro-SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact discs, magnetic tapes, memory cards, memory chips, and other magnetic or optical media.

During the execution of the search of the locations described in Attachments A , law enforcement personnel are also specifically authorized to compel the subject person to provide biometric features, including pressing fingers (including thumbs) against and/or putting  a face before the sensor, or any other security feature requiring biometric recognition, or any of the devices found at the Subject Premises, on  the Subject Person and/or in the Subject Vehicles that are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments, for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant.